## TLINGIT–HAIDA REGIONAL ELECTRICAL AUTHORITY, Appellant and Cross–Appellee,

v.

## STATE of Alaska, Alaska Public Utilities Commission, the City of Klawock, and Alaska Power Company, Appellees and Cross–Appellants.

Nos. S–8833, S–8834, S–8843.

Supreme Court of Alaska.

Jan. 12, 2001.

---

Roger R. Kemppel, Kemppel, Huffman & Ellis, P.C., Anchorage, and William G. Ruddy, Ruddy, Bradley & Kolkhorst, Juneau, for Appellant/Cross–Appellee.

Martin M. Weinstein, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant State of Alaska, Alaska Public Utilities Commission.

Clyde E. Sniffen, Jr., Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellee/Cross–Appellant City of Klawock.

Robert E. Stoller, Anchorage, for Appellee/Cross–Appellant Alaska Power Company.

Paul L. Dillon, Dillon & Findley, P.C., Juneau, and John J. Leary, Jr., Smith & Leary, Seattle, WA, for Amicus Curiae Klawock Heenya Corporation.

Before MATTHEWS, Chief Justice, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Twenty-five years after it created overlapping service territory between two utilities that later became the Tlingit–Haida Regional Electrical Authority (THREA) and the Alaska Power Company, the Alaska Public Utility Commission (commission) eliminated the overlap in favor of Alaska Power. THREA appeals, alleging that the commission's decision is procedurally flawed, is substantively wrong, is preempted by federal law, and results in a taking of THREA's property without just compensation. Alaska Power, the commission, and Klawock cross-appeal on the takings issue. We affirm the commission's decision.

## II. FACTS AND PROCEEDINGS

This case arises out of Alaska's system of delivering electricity to its rural areas. From 1977 until 1997, THREA operated the electric plant and distribution system in Klawock. Initially Klawock and nearby Craig were geographically and electrically isolated, but in 1989 Alaska Power improved the road between the two towns and completed a connecting power line. As electricity and commerce began to flow along these paths, THREA's and Alaska Power's overlapping service territories came into conflict.

Under AS 42.05.221(a), any electric utility—private or municipal—must secure a certificate of public convenience and necessity, which defines the utility's service territory. The original version of the certification statute—former AS 42.05.194—applied only to privately held utilities; it contained a grandfather clause that entitled utilities to receive certificates of public convenience and necessity for areas that they were already serving when the statute was passed.[1] Alaska Power[2] had been providing electricity to Craig; hence, in applying for its certificate under former AS 42.05.194, Alaska Power requested that its service area include territory surrounding that town, which it described by certain latitude and longitude measurements. In issuing the requested certificate, the commission[3] used the surveyor's system of townships and ranges to describe Alaska Power's service area,[4] explaining that it did so because accurate "protractions" were not available for the territory around Craig.[5] As described in the newly issued certificate, Alaska Power's service area extended beyond the area it had requested, encompassing the town of Klawock, which Alaska Power did not serve.

This situation eventually led to conflicting certificates. In 1970, enactment of AS 42.05.221 extended the original certification requirement to municipal utilities.[6] In 1972 the town of Klawock, which then operated its own electric utility, complied with this new statute by applying for a certificate. In granting Klawock's application, the commission noted the overlap with Alaska Power's certificate:

> The Commission recognizes that the issuance of a certificate to the City of Klawock to serve the area requested in its application would constitute an overlap of operating authority unless additional action is taken. Accordingly, the Commission will examine, in the near future, the issue of revoking the operating authority of [Alaska Power] to furnish electric utility service in the area to be certificated to the City of Klawock by this order.

Despite this statement of intent to take action "in the near future," the commission did not revisit the issue of overlapping certificates until a quarter-century later, when THREA initiated the present proceedings.

THREA entered the picture in 1975, when the Tlingit–Haida Central Council created the utility as a regional electrical authority under AS 18.57. The Tlingit–Haida Regional Electrical Authority is a nonprofit corporation and a subdivision of the state that operates small rural electric utilities in Alaska. THREA's operations are funded by loans from the Rural Electrification Administration. In 1977 THREA purchased Klawock's electric utility with funds borrowed from the Rural Electrification Administration; the commission then issued THREA a certificate to provide electric service to "Klawock and adjacent areas."[7] The commission's order

---

1. See Former AS 42.05.194 (1964).

2. The Alaska Power Company was then called the Alaska Power & Telephone Company.

3. The Alaska Public Utility Commission was then called the Public Service Commission.

4. Townships and ranges are uniform grid blocks measured relative to a specified point. *Black's Law Dictionary* 1266, 1499 (7th ed.1999).

5. A protraction is "the drawing to scale of an area of land." *Webster's New International Dic-*

*tionary of the English Language Unabridged* 1826 (1963). We interpret the reference to protractions in the original certificate to mean that the commission had no detailed surveys of the area Alaska Power requested.

6. See Ch. 113, § 6, SLA 1970.

7. As a condition of its original certificate, THREA agreed that it would be subject to the commission's regulatory powers. But as a political subdivision of the state, THREA retained the option of choosing not to be governed by the

granting THREA's certificate did not mention Alaska Power's overlapping certificate, but its silence on this point is hardly surprising, since no actual conflict then existed: THREA served Klawock and Alaska Power served nearby Craig through distribution grids that were physically isolated.

That isolation ended around 1989, when the state completed a new road and electrical intertie between Klawock and Craig. Soon after, THREA stopped generating its own electricity and began buying wholesale from Alaska Power. THREA also contracted for Alaska Power to perform maintenance on THREA's distribution grid in Klawock. These arrangements left THREA in an advantageous position. With wholesale electricity and contractual maintenance work available through Alaska Power, THREA significantly reduced the cost of servicing its Klawock customers—a large part of its rate base. Yet since THREA was exempt from rate regulation,[8] it was able to charge rates in Klawock that were unusually high in comparison to those charged to other consumers who were connected to Alaska Power's power grid. In effect, THREA was able to use its increased Klawock profits to cross-subsidize electrical service to its more rural, off-grid customers.

Around the time that the intertie went on line, Alaska Power began serving a few customers within the overlapping territory. According to THREA's former general manager, THREA did not object to Alaska Power's serving these customers. Eventually, though, as more Klawock consumers clamored for Alaska Power's services, THREA felt threatened by unwanted competition. In May 1993, THREA sent a letter asking the commission to cut Klawock out of Alaska Power's territory. The commission construed the letter to be a formal petition, and opened a docket. After receiving comments from Alaska Power, it denied THREA's petition without prejudice, finding that THREA had not proved that excluding Alaska Power from Klawock would be in the public interest.

Two months later, THREA filed a second petition, renewing its request to remove the overlap between THREA's and Alaska Power's service areas. The commission responded by opening docket U–94–2 and by formally designating Alaska Power a party to the proceeding. The town of Klawock then moved to intervene, and the commission granted its motion.

The commission conducted several hearings on THREA's petition. At a consumer hearing in Klawock, ten of THREA's Klawock customers voiced their desire to be switched from THREA's service to Alaska Power's because Alaska Power's rates for Prince of Wales Island were significantly lower than THREA's rates for Klawock. THREA did not have an opportunity to cross-examine the consumer witnesses. The commission also heard evidence concerning THREA's performance as a public utility: its management and distribution systems, rates, outages, and system of consumer representation.

After taking the matter under consideration, the commission issued its judgment in Orders Nine and Ten. Order Nine laid out the commission's factual findings. The most significant of these were: (1) the representation of THREA and Alaska Power throughout the proceedings provided sufficient due process to allow the commission to modify both certificates; (2) the Klawock consumer reaction "demonstrated a level of dissatisfaction with utility service heretofore unheard of"; (3) THREA's rates were distorted; (4) THREA's service and rates were unregulated because it is a political subdivision of the state; (5) unlike most political subdivisions, THREA was not politically responsible to all of its customers;[9] and (6) since the intertie was built, THREA has acted largely as a broker for power generated and delivered by Alaska Power. In light of these findings, the commission determined that, under AS

---

commission's rate making power. *See* AS 42.05.711. In 1990 THREA requested, and the commission approved, an exemption from rate regulation.

**8.** *See supra* note 7.

**9.** THREA is governed by a board chosen by the Tlingit–Haida Council. Thus, one must be on the Council rolls even to have indirect representation on THREA's board.

42.05.221(d) and .271, competition between THREA and Alaska Power is not in the public interest, and there was good cause for awarding the Klawock territory to Alaska Power.

THREA appealed this decision to the superior court, raising three issues: (1) THREA did not receive due process, particularly the opportunity to cross-examine the consumers testifying at the Klawock consumer input hearing; (2) decertifying THREA amounted to an uncompensated taking of THREA's property; and (3) the commission's action was preempted by the federal Rural Electrification Act.

On the preemption issue, the superior court ruled that, by showing that the commission's action may have jeopardized some of THREA's Rural Utility Service loans, THREA had set forth a prima facie case of frustration of federal purpose under the federal Rural Electrification Act. Accordingly, the court remanded the case to the commission, directing it to take a "hard look" at the impact losing Klawock would have on THREA. On THREA's due process claim, the court directed the commission to provide THREA an opportunity to cross-examine witnesses from Klawock.

On remand, the commission directed the parties to resubmit any testimony from the previous hearings that they wanted the commission to consider; the commission also stipulated that if Alaska Power resubmitted testimony from prior witnesses who had not been cross-examined by THREA, those witnesses would have to be made available for cross-examination at the hearing on remand. In addition, the commission scheduled a hearing to take new evidence concerning the financial impact of removing Klawock from THREA's territory.

This hearing produced extensive economic testimony concerning how the loss of Klawock might affect THREA and its non-Klawock customers. Klawock's expert, Loren Uhlenkott, foresaw a minimal effect; THREA's expert, Dennis Eicher, foresaw economic ruin. These different views arose from differing methodologies. Uhlenkott began by analyzing THREA's actual performance with Klawock included in its service area; he then examined THREA's hypothetical revenue requirements and projected performance ability with Klawock removed from its certificate. His hypothetical model factored in various changes—efficiencies, accounting procedures, and a reduced rate of return—that Uhlenkott believed THREA would be capable of adopting. Eicher, in contrast, analyzed two hypothetical scenarios involving THREA's operations, one with Klawock and one without; as to both scenarios, he applied identical assumptions about rate of return, accounting methods, and management efficiencies, basing these assumptions on THREA's existing situation. In other words, Eicher's analysis presumed that if THREA lost Klawock, it would make no operational changes to adapt to its new situation.

After hearing this evidence, the commission issued its decision on remand. As before, it found that the public interest required that Alaska Power exclusively serve Klawock. Finding Uhlenkott's testimony persuasive, the commission concluded that assigning Alaska Power the exclusive right to serve Klawock would not frustrate the federal purposes of the Rural Electrification Act—subsidizing rural electricity through low interest loans and loan guarantees—because THREA's loss of Klawock would not jeopardize that utility's financial well-being or the Rural Electrification Act loans that Klawock's physical plant secured.

THREA again appealed to the superior court, which affirmed the commission's decision but found that THREA's loss of the use of its Klawock facility amounted to a de facto taking that entitled THREA to "recover fair value for the property taken." The court again remanded the case to the commission, directing it to determine the fair value of THREA's Klawock property.

THREA appeals, challenging multiple aspects of the commission's and the superior court's orders. Alaska Power, the commission, and Klawock cross-appeal certain aspects of the superior court's de facto taking decision.

## III.  DISCUSSION

### A.  Ripeness

■■■ Because the superior court remanded this case to the commission for further proceedings, its decision is not an appealable final order:

> [A] decision of a superior court, acting as an intermediate appellate court, which reverses the judgment of the court below or the decision of an administrative agency and remands for further proceedings, is a non-final order of the superior court.[10]

Nevertheless, we may "treat an appeal improperly brought from a non-final judgment as a petition for review in order to prevent hardship and injustice."[11]  The remand ordered by the superior court would focus on the value of THREA's physical plant, which the commission's certificate modification order effectively forces THREA to sell.  That value turns on whether or not THREA's certificate is property for which compensation is due.  If it is, then a fundamentally different approach to valuation would be necessary.  Furthermore, if THREA prevails on its federal preemption and indispensable federal party arguments, the pending proceedings on remand would be inappropriate.  Given these circumstances, we conclude that it is "necessary to provide immediate guidance" on the matters before us, and we choose to review this case as though it were properly presented through petitions for review.[12]

### B.  Standard of Review

■■■ When, as here, the superior court acts as an intermediate appellate court, we decide legal questions ourselves and directly review the agency's decision.[13]  We independently review questions of constitutional law, federal preemption, and administrative procedure, substituting our judgment for that of the agency.[14]  But when the commission decides issues that fall within its unique expertise, such as issues dealing with rural utility policy goals, we defer to reasonable agency determinations that are "supported by the evidence in the record as a whole."[15]  We review the commission's findings of fact for clear error, reversing them only if they are "not supported by substantial evidence on the whole record."[16]

### C.  Modification of THREA's Certificate

#### 1.  Removal of Klawock from THREA's service area

■■■ Alaska Statute 42.05.271[17] broadly authorizes the commission to amend, modify, suspend, or revoke a utility's certificate when it finds good cause to do so in light of the requirements of public convenience and necessity.  In deciding to delete Klawock from THREA's service area, the commission relied on this provision, finding that the requirements of public convenience and necessity justified the modification.  THREA complains, however, that the commission failed to give adequate notice of its intent to modify THREA's certificate and that it improperly forced THREA to bear the burden of prov-

---

10. *City and Borough of Juneau v. Thibodeau*, 595 P.2d 626, 629 (Alaska 1979).

11. *Id.* at 631.

12. *Id.*

13. *See Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992).

14. *See id.*

15. *Id.* (quoting *Kodiak·Western Alaska Airlines, Inc. v. Bob Harris Flying Serv., Inc.*, 592 P.2d 1200, 1203 n. 7 (Alaska 1979)).

16. *City of Fairbanks v. Alaska Pub. Utils. Comm'n*, 611 P.2d 493, 495 (Alaska 1980).

17. AS 42.05.271 reads:

> Upon complaint or upon its own motion the commission, after notice and opportunity for hearing and for good cause shown, may amend, modify, suspend, or revoke a certificate, in whole or in part. Good cause for amendment, modification, suspension, or revocation of a certificate includes
> (1) the requirements of public convenience and necessity;
> (2) misrepresentation of a material fact in obtaining the certificate;
> (3) unauthorized discontinuance or abandonment of all or part of a public utility's service;
> (4) wilful failure to comply with the provisions of this chapter or the regulations or orders of the commission; or
> (5) wilful failure to comply with a term, condition, or limitation of the certificate.

ing the absence of good cause for the modification.

THREA bases these arguments on the specific manner in which this case arose before the commission. THREA opened the commission proceedings with its petition to modify Alaska Power's certificate by removing Klawock from Alaska Power's service area.[18] In evaluating THREA's request, the commission eventually began to consider whether a better course might be to modify THREA's certificate instead by ousting THREA from Klawock. It ultimately chose that option.

THREA argues that, upon converting the proceeding from one in which Alaska Power's certificate was at issue to one that considered modifying THREA's certificate, the commission should have notified THREA of the change and should have formally shifted to THREA's adversaries the burden of establishing good cause for the modification. THREA reasons that, because the commission failed to do so, its order modifying THREA's certificate violates due process and is invalid.

The commission has never published rules explaining what burden of proof applies in proceedings before it, but a case decided by this court and a recent commission decision suggest that when a proceeding places a utility's certificate at risk of being unfavorably modified, the usual practice is to assign the burden of proof to the commission or to a complaining party.[19] Here, Alaska Power did not formally move to modify THREA's certificate, and the commission gave THREA no formal notice that the proceedings had been expanded to encompass such a modification. Yet the expanded scope of the proceedings was made unmistakably clear to all parties at an early stage of the proceedings. At the August 3, 1994, consumer hearing, commission staff explained that the commission had four options before it: "1) to maintain the status quo with regard to the service area; 2) to award the entire service area to [THREA]; 3) to award the entire service area to [Alaska Power]; or 4) to divide the service area into two exclusive service areas."

Although the commission reiterated its intent to consider these options during later evidentiary hearings, THREA never objected that the option of modifying THREA's petition was not properly before the commission, never complained that it lacked prior notice of this option, and never suggested the need for a formal complaint alleging good cause for modification of its certificate. Instead, THREA simply acquiesced to the commission's characterization of its available options and continued to litigate the case on its merits.

In deciding to modify THREA's certificate, the commission explicitly determined that all parties were afforded sufficient notice and opportunity to be heard. On appeal, THREA offers no indication of how it might have proceeded differently had it received more formal notice that its own certificate was at issue or how such notice might have changed the ultimate outcome of the proceedings. Given that AS 42.05.271 broadly authorizes the commission to modify any certificate for good cause "[u]pon complaint or upon its own motion," given THREA's actual knowledge, early on, that the commission would consider the option of modifying either or both certificates, and given THREA's failure to voice an objection after it acquired this knowledge, we conclude that the commission's failure to give THREA more formal notice that its certificate might be modified amounted, at most, to harmless error.

■ We reach the same conclusion on THREA's claim that the commission erred in failing to formally shift the burden of proving good cause for modification. Although the commission's decision makes passing reference to THREA's failure to meet its burden,

18. At the time, THREA did not claim that Alaska Power's certificate to serve Klawock was invalid.

19. See North State Tel. Co., Inc. v. Alaska Pub. Utils. Comm'n, 522 P.2d 711, 716 (Alaska 1974) (quoting a commission chairman as saying, "The Commission's opening case will be presented by ... legal counsel for Alaska Public Utilities Commission. To the extent of any contested factual issues that will develop in this hearing, the burden will be on the Commission to establish its contentions unless otherwise indicated." (alteration in original)); Re: Norgasco, Inc., 9 APUC 446, 1989 WL 418500 (May 16, 1989).

the decision also makes it abundantly clear that the commission did not find this to be a close case that might turn on the allocation of burdens rather than on positive proof of good cause for modification. The commission made strong and specific findings concerning the undesirability of THREA's continuing to provide service to Klawock; these findings are supported by substantial, affirmative record evidence. And THREA makes no realistic effort to demonstrate how a formal change in the allocation of burdens could conceivably have changed this decision.[20]

■ Instead, THREA advances two evidentiary points arising from the superior court's original order on remand. First, THREA claims that the commission ignored the superior court's order to disregard any consumer testimony presented during the first round of hearings unless THREA was afforded the opportunity for cross-examination on remand. But the commission expressly determined on remand that it would not consider any pre-remand testimony unless the parties specifically designated the testimony and provided an opportunity for cross-examination. THREA infers that the commission must have disregarded this determination because it ultimately found that "the public interest requires that the consumers in Klawock receive electrical service from an entity that can provide safe, reliable service at a reasonable rate." According to THREA, this finding necessarily depends on pre-remand consumer testimony. But other evidence strongly supports a finding that THREA was failing to meet those criteria. For example, the record shows that Alaska Power charged significantly lower rates in locations similar to Klawock, yet Alaska Power performed THREA's maintenance and repair work in Klawock on a contract basis, and

THREA did little more than broker Alaska Power's electricity. These facts alone support a finding that Alaska Power is better suited to provide Klawock with safe, reliable service at a reasonable rate.

■ Second, THREA claims that the commission violated the superior court's order barring it from considering THREA's "postage stamp" rate structure [21] on remand. But THREA's argument misconstrues the court's order, which merely directed that, if other utilities used similar rate structures, THREA's use of a postage stamp rate would not itself amount to good cause for modifying THREA's certificate. On remand, the commission examined THREA's postage stamp rate structure and found that it unfairly burdened Klawock residents. But the commission did not rely exclusively on this factor in finding good cause for modification; instead, it considered a host of other factors. Moreover, the commission did not find that other utilities used similar rate structures. While it heard evidence that Alaska Power, too, used postage stamp rates, this evidence indicated that Alaska Power confined this rate structure to contiguous and geographically similar service areas. Because Klawock was isolated and geographically differed from other communities served by THREA, the evidence concerning Alaska Power effectively distinguished its use of postage stamp rates from THREA's, demonstrating that THREA's rates were not in the public interest because they applied indiscriminately to widely disparate communities.

Since neither of these evidentiary points has merit, THREA has failed to establish that the commission's allocation of the burden of proof amounted to reversible error. Accordingly, we uphold the commission's finding of good cause under AS 42.05.271.[22]

---

20. To support its argument that misallocating the burden of proof amounted to reversible error, THREA also cites *Olson v. AIC/Martin J.V.,* 818 P.2d 669 (Alaska 1991). But in *Olson* we remanded for other reasons without deciding the question of whether misallocation of the burden of proof was harmless error. *See id.* at 672. Where substantial evidence has supported a trial court's ruling, we have not hesitated to affirm the ruling, even though the court misapplied the burden of proof. *See Kodiak Oilfield Haulers v. Adams,* 777 P.2d 1145, 1150 (Alaska 1989).

21. A postage stamp rate structure charges all customers the same rate regardless of the associated cost of serving them.

22. Our conclusion makes it unnecessary to consider THREA's challenge to the commission's alternative finding that modification of THREA's certificate was warranted under AS 42.05.221(d) to eliminate undesirable competition between utilities providing identical service.

### 2. Methodology of Klawock's expert witness, Uhlenkott

The superior court's original remand order required the commission to determine how the loss of Klawock would affect THREA. The parties called various experts on this question. The commission relied on one of Klawock's experts in particular, Loren Uhlenkott, to support its conclusion that the federal purpose of the Rural Electrification Act would not be frustrated if THREA lost the Klawock service area and to support its original conclusion that the public interest would not be served by allowing THREA to continue providing electrical service in Klawock. The superior court upheld the commission's reliance on Uhlenkott. THREA contests this ruling on appeal.

THREA claims that in predicting that THREA would be able to survive financially without Klawock in its service area, Uhlenkott relied on an analytical model that was so flawed as to render his expert opinions fundamentally unreliable. Uhlenkott compared THREA's actual situation, with Klawock included in its service area, to a hypothetical situation adjusted to project THREA's operations without Klawock. In building this analytical model, Uhlenkott adjusted many variables relating to THREA's rate base, most importantly the desired rate of return. THREA attacks this approach because it changed several variables at once. But according to Uhlenkott, he designed his hypothetical model to account for real world adjustments THREA would be capable of making to cope with the loss of its profitable Klawock service area. In contrast, THREA's expert, Eicher, assumed that if THREA lost Klawock, it would make no changes to adapt to offset the loss or ameliorate its financial situation—that it would simply continue to operate just as it had with Klawock.

THREA's challenge to the reliability of Uhlenkott's model posits the validity of Eicher's approach. But it could just as easily be argued that the flawed approach is Eicher's.

In reality, though, neither approach seems so inherently flawed as to be fundamentally unreliable. Both experts presented substantial, albeit opposing, evidence concerning THREA's financial ability to weather the loss of Klawock. The commission had the task of determining the strengths of their competing views and assessing their relative credibility. The commission's ultimate decision to favor Uhlenkott's testimony over Eicher's was not clearly erroneous.

### D. Fair Value of Property Taken from THREA

The superior court ruled that THREA is entitled to recover fair value for its property in Klawock because the decertification order effectively prevents THREA from using that property and therefore amounts to a de facto taking. The court ordered the commission to determine the fair value of THREA's property. On appeal, THREA contends that it should be compensated not just for the value of its physical property in Klawock, but also for the profits it could have made had it continued serving Klawock under its original certificate. In essence, THREA asserts that the certificate itself is valuable property that the commission has taken without just compensation. In response, Alaska Power and the commission do not deny that THREA is due compensation for its stranded facility. But they contest THREA's claim that the proper measure of compensation includes anything more than the fair market value of THREA's stranded Klawock facility.

The Alaska Constitution's takings clause provides: "Private property shall not be taken or damaged for public use without just compensation."[23] This clause must be interpreted generously in favor of the property owner;[24] by requiring the state to pay when property is "damaged," and not just when it is "taken," the clause offers Alaska property owners broader protection than does the federal Constitution's Fifth Amendment.[25] Furthermore, under Alaska's

**23.** Alaska Const. art. I, § 18.

**24.** See *Anchorage v. Sandberg*, 861 P.2d 554, 557 (Alaska 1993) (citing *State v. Doyle*, 735 P.2d 733, 736 (Alaska 1987)).

**25.** See *State v. Hammer*, 550 P.2d 820, 824 (Alaska 1976).

takings clause, any state action that entirely denies a property owner "all the economically feasible use" of the owner's property amounts to a per se taking.[26] Here, because the commission's modification of THREA's certificate had the effect of denying THREA the use of property dedicated to providing Klawock with electrical service, we agree with the superior court that the modification is a per se taking for which compensation is due.

■ But we disagree with THREA's contention that the property taken includes both its stranded Klawock facility and its right, under its original certificate, to operate as a utility in Klawock. The commission originally granted THREA's certificate under a statutory structure that allows certificate modification. Thus, THREA was on notice that modification in the future was a real possibility. Because the commission at all times had the authority to modify THREA's service area under the circumstances presented here, THREA owned no property interest against the commission's regulatory action.

This approach finds support in the United States Supreme Court's decision in *Bowen v. Public Agencies Opposed to Social Security Entrapment.*[27] There, the Court considered whether Congress took private property by eliminating an opt-out provision in the Social Security Act that allowed voluntarily enrolled states to withdraw from the Social Security System. A key ingredient of the case was that Congress had explicitly retained the power to alter the terms of the Act. The Supreme Court ruled that "contractual rights" conferred under the Act were necessarily subject to the sovereign power of the United States and "bear[ ] little, if any, resemblance to rights held to constitute 'prop-

erty' within the meaning of the Fifth Amendment."[28] Distinguishing between the right to withdraw from the Social Security program and direct contractual rights or debts against the federal government, the Court emphasized that Congress had "reserved" the power to alter the opt-out element of the Social Security Act.[29]

■ A certificate of public convenience and necessity presents a similar situation. When the legislature passed AS 42.05.271(1), it gave specific notice that the commission could modify or revoke a certificate of public convenience and necessity upon good cause shown.[30] Thus, the certificate grants a utility like THREA no vested right against the commission's exercise of this regulatory power.[31] Since THREA offers no convincing authority or reason why a certificate should qualify as property when the commission exercises a reserved regulatory power that was a condition of the certificate's original issuance, we conclude that the commission's decertification order is not a compensable taking of business rights conferred by THREA's original certificate.

In summary, the commission's action did strand some of THREA's physical assets. The superior court correctly recognized that THREA must be compensated for those assets, and it properly ordered the commission to determine their value in the next phase of its proceedings. But the court did not err in failing to identify THREA's original certificate as compensable property taken by the commission's order.

■ One aspect of the takings issue remains to be considered. In its cross-appeal, Alaska Power expresses reservations about the commission's impending determination of

---

26. *See Sandberg,* 861 P.2d at 557 (adopting the U.S. Supreme Court's tests for per se takings).

27. 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986).

28. *Id.* at 55, 106 S.Ct. 2390.

29. *See id.*

30. *See also* AS 42.05.221(d) (authorizing the commission to eliminate undesirable competition between utilities providing identical service).

31. THREA cites *Homer Electric Ass'n v. City of Kenai,* 423 P.2d 285 (Alaska 1967), to support its position. But its reliance on that case is unavailing, for although we recognized in *Homer Electric* that "a certificate of public convenience and necessity is a property right and as such is entitled to protection," the case dealt with a municipality's outright condemnation of a competing certificate, rather than its exercise of a reserved regulatory power. *Id.* at 289–90.

the fair market value of THREA's Klawock facilities. Fearing that the price may prove too high, Alaska Power argues that it should remain free to build new facilities in Klawock, thereby stranding THREA's facilities and leaving the state with the burden of paying THREA fair compensation.

But in our view, under AS 42.05.221(d) and other provisions of the Public Utility Act, the commission may direct that Alaska Power purchase the existing Klawock facilities as a condition of its exclusive certification. If Alaska Power disagrees with the commission's evaluation of these assets, it may, of course, resort to its administrative appeal rights. But having come this far in this process, Alaska Power may not back away from the obligation to provide service in Klawock or to acquire THREA's plant, if the commission makes that purchase part of the package.

### E. *Federal Preemption*

■ THREA's operations as a rural utility are funded by federal loans issued under the Rural Electrification Act.[32] The purpose of the Rural Electrification Act is best explained by section 902 of the Act, which "authorizes and empowers" the Secretary of Agriculture

> to make loans in the several States and Territories of the United States for rural electrification and ... for the purpose of furnishing and improving electric and telephone service in rural areas, as provided in this chapter, and for the purpose of assisting electric borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems.[33]

In both of its appeals to the superior court, THREA argued that the commission's decision to modify its certificate frustrated the purposes of the Rural Electrification Act and was therefore preempted by federal law. In THREA's first appeal, the superior court ruled that THREA had presented a prima facie case of federal preemption and remanded the case to the commission for a "hard look" at whether modifications to THREA's permit would frustrate the federal purpose of the Rural Electrification Act. After a new round of hearings, the commission affirmed its initial decision, ruling that the federal purpose of the Rural Electrification Act would not be frustrated by removing Klawock from THREA's service area because the Rural Utility Service's loan interest would be protected and because THREA would be financially capable of continuing to serve other rural areas. The superior court affirmed these findings in THREA's second appeal. THREA challenges the superior court's ruling and argues federal preemption.

■ The law of federal preemption "is derived from the supremacy clause of article VI of the federal Constitution, which declares that federal law shall be 'the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' "[34] Thus, state regulation that conflicts with federal law cannot stand.

■ To determine whether Congress has preempted state action in a particular arena, we "look to the policy, intent, and context of the federal statute to determine whether application of the state law would frustrate the operation of the federal one."[35] Generally, we apply a two-step analysis to preemption questions. First, we look to see whether Congress has overtly preempted the subject matter the state wishes to regulate, either explicitly, by declaring its intent to preempt all state authority, or implicitly, by occupying the entire field of regulation on the subject in question.[36] Second, if neither kind of direct preemption is found, we look to whether federal and state law conflict in this particular instance. If state and federal regulations openly conflict or if state regulations

---

**32.** 7 U.S.C. §§ 901–950.

**33.** *Id.* § 902(a).

**34.** *Bald v. RCA Alascom,* 569 P.2d 1328, 1331 (Alaska 1977).

**35.** *Webster v. Bechtel, Inc.,* 621 P.2d 890, 897 (Alaska 1980) (quoting *Bald,* 569 P.2d at 1331).

**36.** *See Webster,* 621 P.2d at 897–98.

obstruct the purpose of federal regulations, then the supremacy clause blocks the state regulation.[37]

THREA asserts that this latter type of preemption—frustration of federal purpose—is at issue here. According to THREA, the commission's order deleting Klawock from its certificate of public necessity and convenience stands "as an obstacle to the accomplishment and execution of the full purposes and objectives" of the Rural Electrification Act.

■■■ In considering this argument, we must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[38] And we must further recognize, as the Supreme Court has, that "the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."[39]

As we have already pointed out, the Rural Electrification Act's central purpose is to lend money to promote rural electrification.[40] In keeping with the Act's purpose, the United States Supreme Court has described the Rural Electrification Administration as "a lending agency rather than a classic public utility regulatory body."[41] Our own decisions have recognized that the Rural Electrification Act is meant "to provide electric energy to persons residing in rural areas who were not able to receive such services from utility companies serving cities and other populated communities."[42]

Because the Rural Electrification Act was designed to promote rural electrification by offering financial incentives to utilities that serve outlying areas, direct interference with property mortgaged to the Rural Utility Service could conceivably frustrate the purposes of the Act. But legitimate regulation of a utility that allows the Rural Utility Service and its loan recipient to recoup their investments, does not. Thus, as the United States Supreme Court expressly noted in the context of rate setting, the Rural Electrification Administration has been "expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures ... within the constraints of existing state regulatory schemes."[43] Here, the fact that this federal role does not act as a substitute for existing state regulation is demonstrated by Rural Utility Service's insistence that THREA obtain a certificate of public convenience and necessity as a condition of receiving its Rural Electrification Act loan.

Although courts considering federal preemption under the Rural Electrification Act in contexts other than rate regulation have split on the issue,[44] we believe that *Stilwell v. Ozarks Rural Electric Cooperative* represents the better view. In *Stilwell*, relying on the trial court's determination that a rural utility would not suffer financial jeopardy if it lost a contested service area, the Tenth Circuit Court of Appeals held that the Rural Electrification Act did not preempt state action restricting the utility's territory, declining "to read the [Rural Electrification Act] so broadly as to expand the [Rural Utility Service's] authority beyond that which is ... 'derivative of the Administrator's responsibilities for the operation of the loan and guaran-

---

37. *See id.* at 897, 900–01; *Bald,* 569 P.2d at 1331.

38. *Webster,* 621 P.2d at 898 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)).

39. *Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983).

40. 7 U.S.C. § 902(a).

41. *Arkansas Elec. Coop.,* 461 U.S. at 386, 103 S.Ct. 1905.

42. *City of Fairbanks v. Electric Distribution Sys.,* 413 P.2d 165, 167 (Alaska 1966).

43. *Arkansas Elec. Coop.,* 461 U.S. at 386, 103 S.Ct. 1905.

44. *Compare City of Morgan City v. South Louisiana Elec. Coop. Ass'n,* 31 F.3d 319, 321 (5th Cir.1994) (determining that a Louisiana condemnation proceeding would frustrate the purpose of the Rural Electrification Act and so was preempted by federal law) *with Stilwell, Oklahoma v. Ozarks Rural Elec. Coop. Corp.,* 79 F.3d 1038 (10th Cir.1996) (holding that condemnation under state law was not preempted).

tee programs under the [Rural Electrification Act].' "[45]

THREA attempts to distinguish *Stilwell*, arguing that a Rural Utility Service officer in that case agreed that loss of the contested service area would not be harmful to the rural utility's economic future; in contrast, here, a Rural Utility Service officer testified that losing Klawock would doom THREA. But preemption requires something more than the personal prediction of an agency official. For as the United States Supreme Court has noted, federal officials have not "always welcomed state regulation of rural power cooperatives, or thought it was a good idea. . . . But, of course, such expressions of opinion do not constitute sufficient grounds for pre-emption."[46] In the present case, after hearing substantial evidence on both sides of the issue-including testimony from Klawock's expert that favored Alaska Power-the commission found that THREA would be capable of surviving the loss of Klawock. Faced with conflicting evidence on the relative merits of different approaches to utility management, we apply a deferential standard of review and rely on the commission's considerable expertise in resolving such matters.[47] Because substantial evidence supports the commission's finding that THREA will not founder if it loses Klawock, we will not disturb that finding.

Given the commission's findings that THREA's continuing service of Klawock was not in the public interest, that the loss of that service area would not jeopardize THREA's ability to serve other rural areas, and that THREA must be justly compensated for the federally-financed facilities that the commission's action would strand, we do not see how the commission's decertification order frustrates the federal purpose of capitalizing rural electrification. Accordingly, we affirm the superior court's ruling that federal law does not preempt the commission's action.

### F. *Indispensable Party*

Finally, we turn to the question of whether the Rural Utility Service was an indispensable party to this action.[48] Alaska Civil Rule 19 governs courts in deciding whether an absent party is indispensable to particular court proceedings. Rule 19(a) describes when courts must join absent parties, if possible.

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

Rule 19(b) explains how courts should proceed when joinder is impossible:

> If a person as described in subsection (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court

**45.** *Stilwell*, 79 F.3d at 1044 (quoting *Wabash Valley Power Ass'n v. Rural Electrification Admin.*, 988 F.2d 1480, 1489–90 (7th Cir.1993)).

**46.** *Arkansas Elec. Coop.*, 461 U.S. at 386 n. 10, 103 S.Ct. 1905.

**47.** *Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992).

**48.** We review a trial court's rulings on indispensable party status for abuse of discretion. *See In Re Pacific Marine Ins. Co. of Alaska in Liquidation*, 877 P.2d 264, 268 (Alaska 1994).

include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for non-joinder.

Although this rule does not directly apply to administrative actions, we agree with THREA that it appropriately balances the equities involved when a case arises without all necessary parties. The rule thus provides relevant guidance.[49] Moreover, since administrative adjudications are reviewed by courts that are bound by Rule 19, the most consistent approach is to apply Rule 19 at the outset.

The parties agree that the Rural Utility Service has declined to take part in these proceedings and cannot be required to participate because it is cloaked by the sovereign immunity of the United States. Therefore, we look to Rule 19(b) to answer whether this litigation should have continued, based on: (1) the prejudice to the Rural Utility Service or the existing parties, (2) how relief may be shaped to avoid prejudice, (3) adequacy of such relief, and (4) what remedy is left if the action is dismissed.

Here, the commission found that its inability to order the Rural Utility Service to be joined as a party caused insufficient prejudice to justify dismissing the docket. In reaching this conclusion, the commission distinguished *City of Fairbanks v. Electric Distribution System*,[50] where we ruled that the Rural Utility Service was an indispensable party in a condemnation proceeding against property for which it held a mortgage.[51] We agree with the commission's reasoning.

Though similar to this case in many ways, *City of Fairbanks* is distinguishable because the regulatory context here allows a remedy to be fashioned that protects the Rural Utility Service's unrepresented interests. *City of Fairbanks* involved a pure condemnation proceeding; Fairbanks sought to acquire customers from the densely populated portion of a rural utility's territory, evidently to add to the service area of its own municipal utility.[52] In that circumstance, the rural utility and the Rural Utility Service were the only parties concerned with the provision of electricity to the rural areas outside the contested service area. We thus explained that

the United States has an interest in this litigation that would be adversely affected by a judgment condemning the electric distribution facilities in the Island Homes Subdivision. It is an interest that would not be satisfied merely by repayment from the condemnation proceeds of the pro tanto portion of the money the United States has loaned.... The interest of the United States is not merely that of a money lender who expects repayment of its loan with interest. The interest of the United States is in seeing to it that [the rural utility it has financed] is able to continue to provide electrical services at reasonable rates to the rural areas it has undertaken to serve. This it may not be able to do if the cream of its consumers of electrical energy in the densely populated areas is skimmed off by another utility.... [53]

In the present situation, by contrast, the superior court initially remanded this case so that the commission could take a "hard look" at how the loss of Klawock would affect THREA's ability to serve other rural areas. On remand, the commission then heard testimony from several experts, including the Rural Utility Service, regarding THREA's future. Afterwards, the commission specifically found that the loss of Klawock would not unduly damage THREA. Thus, our con-

**49.** *Cf. Hammond v. North Slope Borough*, 645 P.2d 750, 766–67 (Alaska 1982); *Pan American Petroleum Corp. v. Shell Oil Co.*, 455 P.2d 12, 16 (Alaska 1969).

**50.** 413 P.2d 165 (Alaska 1966).

**51.** *See id.* at 168.

**52.** *See id.* at 167.

**53.** *Id.* at 168.

cerns in *City of Fairbanks* were specifically addressed by the commission. This effort by the commission satisfied the four elements of Rule 19(b).

First, the commission's treatment of this case avoids undue prejudice to the parties or to the Rural Utility Service, itself. THREA points out various problems that might arise by proceeding without the participation of the Rural Utility Service.[54] In our view, the commission's planned second phase of hearings is more likely to result in an equitable resolution of the issues than would a dismissal based on the Rural Utility Service's absence. If this action were dismissed, THREA and Alaska Power would be in direct competition for Klawock customers and there would be no guarantee that THREA would receive anything for its facilities if it lost its Klawock business to Alaska Power, its wholesale supplier. Under the commission's proposed procedure, THREA will be able to recoup the value of its Klawock facility, which will offer it the opportunity to apply that capital to its Rural Utility Service loans and to investments in other rural areas.

The second element of Rule 19(b)—the commission's ability to fashion a protective remedy lessening or avoiding prejudice in the Rural Utility Service's absence—also supports the commission's decision to proceed. In the next phase of its proceedings, the commission can assure THREA and the Rural Utility Service alike the opportunity to receive optimal value for THREA's Klawock property. We are similarly satisfied that the proceedings on remand will address Rule 19(b)'s third element by ensuring the adequacy of the ultimate judgment in the Rural Utility Service's absence.

And turning to the final element of Rule 19(b)—the adequacy of the plaintiffs' remedy in the event of a dismissal for nonjoinder—we again find little reason to declare the Rural Utility Service an indispensable party. In the event of a dismissal, both Alaska Power and THREA would keep Klawock within their service territories; unregulated market forces presumably would decide the fate of THREA's Klawock facility, leaving neither the commission nor Alaska Power under any obligation to purchase it in the future. Because the commission could reasonably deem this remedy to be undesirable, we conclude that the commission did not abuse its discretion in ruling that the Rural Utility Service was not an indispensable party.

## IV. *CONCLUSION*

For these reasons, we AFFIRM the superior court's order and REMAND this case to the commission for further proceedings consistent with this opinion.

EASTAUGH, Justice, not participating.

---

**54.** Thus, THREA claims that unless the Rural Utility Service is a party, THREA may become subject to inconsistent obligations because its loan agreement forbids it from selling or negotiating the sale of "any part of [the Klawock physical plant] without prior written approval" from the Rural Electrification Administrator. THREA also claims that any order directing it to sell its Klawock facilities to Alaska Power will be impossible to fulfill without the Rural Utility Service's blessing. THREA separately expresses concern that the Rural Utility Service might be prejudiced because its interests go beyond those of a mere lender. But this concern is addressed by the commission's finding that THREA will be capable of continuing to serve its other rural territory after it loses Klawock.