**CITY OF COOKEVILLE, TENNESSEE**
Plaintiff,

v.

**UPPER CUMBERLAND ELECTRIC MEMBERSHIP CORPORATION, et al., Defendants.**

No. 2:02–0093.

United States District Court,
M.D. Tennessee,
Northeastern Division.

March 17, 2005.

John H. Sinclair, Jr., Tennessee Attorney General's Office, Frank Stovall King, Jr., King & Ballow, Nashville, TN, Thomas Michael O'Mara, O'Mara & Johnson, PLLC, Cookeville, TN, for Plaintiffs.

J. Richard Lodge, W. Brantley Phillips, Jr., Russell S. Baldwin, Bass, Berry & Sims, Nashville, Jacky Orange Bellar, Bellar & Bellar, Carthage, TN, Robert C. Watson, Office of the United States Attorney, Nashville, TN, Frances M. Toole, Department of Justice, Ben Franklin Station, Georgann Gutteridge, U.S. Department of Agriculture, General Counsel/Rural Utilities Division, Washington, DC, Paul C. Ney, Jr., Trauger, Ney & Tuke, Nashville, TN, for Defendants.

## *MEMORANDUM*

WISEMAN, Senior District Judge.

### BACKGROUND

On July 31, 2001, the City of Cookeville Department of Electricity ("Cookeville" or "Plaintiff") filed a Complaint in the Circuit Court for Putnam County, Tennessee, seeking to condemn Upper Cumberland Electric Membership Corporation's ("UCEMC") facilities and service rights within five areas recently annexed by Cookeville. In order to comply with Tenn. Code Ann. § 29–16–106, which requires that all parties having any interest in the land or rights involved in an eminent domain case be made defendants, Cookeville added as defendants the federal Rural Utilities Service ("RUS"), an agency of the United States Department of Agriculture, and the National Rurual Utilities Cooperative Finance Corporation ("CFC"). On November 20, 2002, RUS removed this matter to federal district court pursuant to 28 U.S.C. § 1442(a)(1). On May 15, 2003, this Court consolidated the original action to condemn five areas with another action seeking to condemn four additional service areas. UCEMC has over $33,000,000 in outstanding long-term debt, all of which is secured by mortgages held by RUS and CFC on all of UCEMC's property, including the property at issue in this case.

RUS opposes the proposed condemnations and issued an opinion stating its opposition and detailing the reasons thereof.

On November 15, 2004, this action was heard in a bench trial before the Honorable Thomas A. Wiseman, Jr., Senior District Judge for the United States District Court for the Middle District of Tennessee.

## ISSUE BEFORE THE COURT

While this litigation has been long and sometimes contentious, there is only one central issue before this Court, whether the proposed condemnations frustrate the purpose of the REA. If they do not, then state law is controlling, and the Court should make the calculation required by Tenn.Code Ann. § 6–51–112(a)(2). If the Court finds that the proposed condemnations do frustrate the purpose of the REA, then the condemnation proceedings will be dismissed.

## CASE LAW

The Court's ruling on partial summary judgment on March 25, 2003 lays out the applicable case law. As it was discussed thoroughly in that order, only a summary is necessary here.

The case law surrounding the issue of condemning service areas of utilities founded under the REA and funded by the RUS is fairly sparse. The United States Court of Appeals for the Sixth Circuit has yet to rule on the issue, and as such, this Court will treat this as a case of first impression. Two lines of thought have developed in the case law from other circuit and state courts. The first states that state law allowing condemnation of utilities founded under the REA and financed by the RUS are preempted by federal law and, as such, are invalid in their application to these utilities, **unless the RUS approved of the condemnations.** *See Public Utility District No. 1 of Pend Or-*

*eille Cty. v. United States,* 417 F.2d 200 (9th Cir.1969); *Public Utility District No. 1 of Franklin Cty. v. Big Bend Elec. Coop., Inc.,* 618 F.2d 601 (9th Cir.1980); *City of Morgan City v. South Louisiana Elec. Coop. Assoc., et al.,* 31 F.3d 319, 320 (5th Cir.1994). The second line of thought is that the REA was not meant to preempt state law, but rather to operate within the framework of existing state law, thus allowing for condemnation of rural cooperatives. *See City of Stilwell v. Ozarks Rural Elec. Coop. Corp., et al.,* 79 F.3d 1038 (10th Cir.1996); *Tlingit–Haida Regional Electrical Authority v. Alaska, et al.,* 15 P.3d 754 (Alaska 2001).

The purpose of the REA was to electrify rural areas of the United States. *See Pend Oreille,* 417 F.2d at 201; *City of Morgan City,* 837 F.Supp. at 195; *Wabash Valley Power Assoc. v. REA,* 988 F.2d 1480, 1489–90 (7th Cir.1993) (stating that the federal purpose for the REA is the goal of rural electrification as well as the goal of getting paid in full for the loans issued). The courts recognized that this purpose could be hindered by condemning service areas without paying sufficient compensation. *See id.* The courts further held that, as the body appointed by Congress to the be arbiter of these questions, the RUS decision to approve or disapprove of a proposed condemnation should be given great deference. *See Public Utility District No. 1 of Franklin Cty.,* 618 F.2d at 603; *City of Morgan City,* 837 F.Supp. at 198; *City of Morgan City,* 31 F.3d at 324.

The first line of thought was largely developed before the United States Supreme Court issued its opinion in *Arkansas Elec. Coop. Corp. v. Arkansas Public Serv. Commission,* 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983); *but see City of Morgan City,* 49 F.3d at 1075 (in a denial for rehearing, the Fifth Circuit upheld its

earlier ruling **after** the *Arkansas Elec. Coop. Corp.* decision was issued). The facts of *Arkansas Elec. Coop. Corp.* are not identical to the case at bar, but similar enough to warrant an examination of the Court's reasoning.

In *Arkansas Elec. Coop. Corp.*, a plaintiff cooperative that received funding through the REA challenged the jurisdiction of the Arkansas Public Service Commission [Arkansas PSC] to control its rates. *Arkansas Elec. Coop. Corp.*, 461 U.S. at 377, 103 S.Ct. 1905. The plaintiff cooperative did not actually provide power directly to rural individuals, but sold it to its member cooperatives who then distributed the power. *Id.* The Arkansas PSC asserted jurisdiction over the rates charged by the member cooperatives based on state statutes. *Id.* at 382, 103 S.Ct. 1905. The cooperative asserted that state regulation of the rates was preempted by the REA. *Id.* The Arkansas Supreme Court upheld the Arkansas PSC's jurisdiction over rates, and the United States Supreme Court affirmed. *Id.* The Court initially held: "Nothing in the Rural Electrification Act expressly pre-empts state rate regulation of power cooperatives financed by the [RUS]." *Id.* at 385, 103 S.Ct. 1905. As to the argument that the state's involvement would frustrate the important federal interest behind the REA, the Court responded that "the legislative history of the Rural Electrification Act makes abundantly clear that, although the [RUS] was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes." *Id.* at 386, 103 S.Ct. 1905. The Court continued:

> There may come a time when the [RUS] changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course pre-empt any further exercise of jurisdiction by the Arkansas PSC.... the PSC can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the [RUS]. Moreover, even without an explicit statement from the [RUS], a particular rate set by the Arkansas PSC may so seriously compromise important federal interests, including the ability of [the cooperative] to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act. We will not, however, in this facial challenge to the PSC's mere assertion of jurisdiction, assume that such a hypothetical event is so likely to occur as to preclude the setting of any rates at all.

*Id.* at 388–89, 103 S.Ct. 1905 (internal citations omitted). Thus, *Arkansas Electric* involved a different set of facts—setting rates instead of condemning facilities—and was decided on a facial challenge to the state agency's jurisdiction.

After the decision in *Arkansas Elec. Coop. Corp.*, the second line of cases developed which allowed condemnation of rural cooperatives. The United States Court of Appeals for the Tenth Circuit was faced with a case similar to the case at bar and concluded that, in light of *Arkansas Elec. Coop. Corp.*, the REA and RUS were to operate within the bounds of state law, and condemnation under state law should be allowed. *City of Stilwell*, 79 F.3d at 1044. The *City of Stilwell* court stated that the reasoning in the first line of cases was in error after *Arkansas Elec. Coop. Corp.* In *City of Stilwell*, the RUS did not oppose the condemnation and specifically described the impact of the proposed condemnation as "minimal." *Id.* at 1045.

Most recently, the Supreme Court of Alaska in *Tlingit–Haida Regional Electrical Authority v. Alaska, et al.*, 15 P.3d 754,

757 (Alaska 2001) considered both the first and second line of thought and concluded that the second made more sense after the *Arkansas Elec. Coop. Corp.* decision. The court reasoned that, because the REA was designed to promote rural electrification, direct interference with property mortgaged to the RUS "could conceivably frustrate the purposes of the Act." *Id.* Such is not the case, however, if the state regulation is legitimate and allows the utility to recoup its investments. *Id.* In *Tlingit–Haida Regional Electrical Authority,* an RUS officer testified that losing the disputed service area would doom the utility and its ability to repay the loans. *Id.* at 768. The court, however, refused to rely on such a personal prediction, but instead deferred to the state commission's determination that the utility would be capable of surviving the loss of the contested service area. *Id.*

## THE VIEW ADOPTED BY THIS COURT

As stated above, this case is one of first impression in the Sixth Circuit. As such, the Court lends persuasive weight to all of the decisions above, but must arrive at a conclusion as to which is the correct approach to the issue at hand. This Court chooses to adopt neither of the two views, but rather, a combination.

█ Congress may preempt state authority, within Constitutional limits, by so stating in express terms. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Commission, et al.,* 461 U.S. 190, 203, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). Absent explicit language, Congress' intent to supersede state law may be found in two ways. *Id.* at 204, 103 S.Ct. 1713. First, Congress may "occupy the field" by enacting legislation so pervasive and dominant that the federal system will be presumed to preclude enforcement of state laws on the same subject. *Id.* (citing *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 151, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). Second, "[e]ven where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law ... when 'compliance with both federal and state regulations is a physical impossibility' ... or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). It is this final version of preemption the Court finds applies to this situation.

█ There is no question that the purpose of the REA is to electrify rural America. With that in mind, this Court finds that no condemnation, or state law that allows such condemnations, can be upheld that directly conflicts with that purpose. That, however, is a far cry from saying that all condemnations of cooperatives established under the REA are per se illegal due to the Supremacy Clause. **It only means that any condemnation that hinders rural electrification that is currently in place and provided by a cooperative established under the REA is illegal.** That is the rule that this Court adopts.

█ This, of course, begs the question of who the better arbiter of whether a condemnation hinders rural electrification provided by a RUS funded cooperative is—the RUS or the courts. The answer to this question determines how much weight the RUS decision is given in consideration of whether or not to allow a condemnation; whether to treat an RUS decision with great deference, only reversible if found to be arbitrary or capricious, or as persuasive evidence. This was a question that puz-

zled the Court. On the one hand, it makes good sense that the RUS would in a very good position to determine whether a proposed condemnation would hinder rural electrification. There is no reason to believe, however, the RUS would be better qualified than a state commission that specializes in public utilities (as the Alaska Supreme Court relied on).

There is the argument that Congress established the RUS, and as such, intended the RUS to be the decision maker. This Court, however, finds this argument unpersuasive. Congress established the RUS more as an administrative lending body to determine who was credit-worthy and to promulgate regulations to ensure those receiving funding would maintain their credit-worthiness and continue to electrify rural areas. The RUS is no more qualified than any other expert to determine whether a condemnation would hinder rural electrification. If information were shared, as it should be in a trial, the resulting battle of experts would be best settled by the court rather than blindly accepting the RUS decision and disregarding the opposing experts. As such, the Court finds that it should be the arbiter of this decision.[1]

## APPLICATION TO THE CASE AT BAR

■ Given the view of the law as it stands articulated above, the final question of whether this specific condemnation frustrates the REA can now be resolved. The RUS issued an administrative opinion detailing its opposition to the proposed condemnations. The City of Cookeville provided an expert that testified that the condemnations would not cripple UCEMC's ability to service rural areas and thus, the condemnation should be allowed. After weighing each party's evidence carefully, the Court finds that these proposed condemnations do not frustrate the REA as long as sufficient compensation is given to the cooperative.[2] The question of what that compensation should be is the only one left for resolution.[3]

Tenn.Code Ann. § 6–51–112(a)(2) provides the formula for which compensation is to be determined in condemnation cases such as this one. The formula states that just compensation equals the sum of: the present day reproduction costs of the facilities being acquired, less depreciation computed on a straight line basis; reintegration costs; and annual payments for ten years that are calculated as a function of revenues from the condemned sites. The

---

**1.** It is important to note that throughout this discussion, the Court has maintained that the purpose of the REA is to electrify rural America, not to recover its funds lent. This omission is intentional. The Court will not extend the purpose of the REA to include this for fear of the slippery slope to which it may lead. To invalidate state law per the Supremacy Clause due to the presence of federal funds would have far reaching effects that this Court does not endorse.

**2.** The Court here is not disregarding the RUS opinion. In fact, the Court wishes it had been more specific as to what amount of damages would have led to the RUS consenting to the condemnation. As discussed in greater detail below, the RUS opinion was based upon com-

pensation proposed by Cookeville that the Court also finds insufficient. The Court is convinced, after hearing representatives from the RUS testify, that had the number the Court is finding for compensation been presented to the RUS, it would have approved of the condemnation.

**3.** In fact, due to the nature of the Tennessee formula for determining just compensation for utility condemnation articulated in Tenn. Code Ann. § 6–51–112(a)(2) and the surrounding case law that allows for upward adjustments, this Court is hard pressed to think of a situation when the proposed condemnation would be invalid under the Supremacy Clause.

parties stipulated to the first and third parts of the formula, agreeing that: the present day reproduction costs less depreciation equal $1,136,325.25; and the ten annual payments as a function of revenue equal $276,330.00 per year. That leaves the Court only to determine the reintegration costs.

Tenn.Code Ann. § 6–51–112(a)(2)(B) describes reintegration costs as, "[a]n amount equal to the cost of constructing any necessary facilities to reintegrate the system of the cooperative outside the annexed area after detaching the portion to be sold..." There was some argument at trial as to whether this definition meant the cost of returning the system to running as well as it had before or whether it meant the cost of making the system adequate for operation. After considering the parties' arguments, and finding no decisive, binding case law, the Court adopts the opinion that reintegration costs are those costs associated with returning the system to running as well as they had before the condemnation—no extra inefficiencies and no extra costs related to the system.[4]

Given that all parties admitted that at least one of the condemnations would lead to inefficient electric distribution, costs to UCEMC for maintenance of lines no longer serving UCEMC customers and loss of some electricity paid for by UCEMC in lines that are not serving any remaining UCEMC customers (there was disagreement as to the degree of inefficiency and costs in lost electricity) that would result from continued use of the Cookeville substation, the Court finds that reintegration costs equal the cost of a new substation and the cost of restoring UCEMC's distribution loop with the new substation, or $5,825,000 ($2,500,000 for the new substation plus $3,325,000 for the restoration of the distribution loop). Because no evidence was presented at trial as to the cost of the power lines within the annexed areas, the city will not be obligated to pay any additional money for those. The Court further finds that the upward adjustment UCEMC asks for in the amount of $3,173,749 is unwarranted, and that UCEMC will still be able to provide low cost power to its rural customers without this adjustment.[5] Finally, the Court declines to make the downward adjustments proposed by Plaintiff.[6]

This brings the total condemnation damages to a single payment of $6,961,325.25 and 10 annual payments of $276,330.00 per year.

## CONCLUSION

For the reasons set forth above, the Court finds that condemnation damages

4. To force the party losing its property to foot the bill for any additional costs that result from the condemnation, costs that could run annually for the life of the company, would be patently unfair.

5. UCEMC asserts that it is owed this upward adjustment because of the lost revenue from the customers in the annexed areas—saying that these were low cost/high profit customers. To award this amount would be implicitly ruling that, under the REA, customers in non-rural areas should subsidize the rural customers. The Court finds that the REA did not contemplate such a system. The custom-

ers, having been annexed, are no longer inside the rural service areas and the annexing entity has no obligation to pay to subsidize the remaining cooperative customers.

6. Plaintiff asserts that these adjustments are warranted because of Defendants' delay in complying with the Tennessee law related to condemnations. This was a case of first impression that had prior precedent from other circuits that supported Defendant's position. Thus, this Court will not punish Defendant's for choosing to litigate the merits of the case by reducing the payments they are owed.

are $6,961,325.25 plus annual payments in the amount of $276,330.00 for ten years.

## ORDER

For the reasons stated in the attached Memorandum, the Court finds that condemnation damages for the nine areas that are the subject of this litigation are $6,961,325.25 and ten annual payments of $276,330.00.

It is so ORDERED.