*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CITY OF COOKEVILLE, TENNESSEE,

*Plaintiff-Appellant,*

*v.*

UPPER CUMBERLAND ELECTRIC MEMBERSHIP
CORPORATION; HILDA G. LEGG; RURAL UTILITIES
SERVICES, an Agency of the Department of
Agriculture; DEPARTMENT OF AGRICULTURE;
SHELDON PETERSON, Governor; NATIONAL BANK
FOR COOPERATIVES; NATIONAL RURAL UTILITIES
COOPERATIVE,

*Defendants-Appellees.*

Nos. 05-5886; 06-5363

>

---

Appeal from the United States District Courts
for the Middle District of Tennessee at Cookeville and Nashville.
No. 02-00093—Thomas A. Wiseman, Jr., District Judge.

Argued: March 5, 2007

Decided and Filed: April 19, 2007

Before: ROGERS and GRIFFIN, Circuit Judges; RUSSELL, District Judge.[*]

---

## COUNSEL

**ARGUED:** Andree Sophia Blumstein, SHERRARD & ROE, Nashville, Tennessee, for Appellant.
W. Brantley Phillips, Jr., BASS, BERRY & SIMS, Nashville, Tennessee, Frances M. Toole,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:**
Andree Sophia Blumstein, SHERRARD & ROE, Nashville, Tennessee, T. Michael O'Mara,
Cookeville, Tennessee, for Appellant. W. Brantley Phillips, Jr., John R. Lodge, Jr., Russell S.
Baldwin, BASS, BERRY & SIMS, Nashville, Tennessee, Frances M. Toole, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

[*]The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting
by designation.

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  In this case, we affirm the federal district court's resolution of a dispute over one element of the compensation that Tennessee law requires when a city annexes territory and exercises its right to purchase electric utility property within the annexed territory.  The federal court had jurisdiction because a federal agency, the Rural Utilities Service ("RUS"), was a party defendant.  We reverse, however, a post-judgment order enjoining the city from providing electric service in this annexed area pending resolution of the compensation dispute.

When a Tennessee municipality that owns and operates its own electric system annexes territory in which an electric cooperative is providing electric services to customers, the municipality has two choices of how to provide electric services to those customers under Tennessee law.  *See City of South Fulton v. Hickman-Fulton Counties Rural Elec. Coop. Corp.*, 976 S.W.2d 86, 90 (Tenn. 1998).  The municipality can either "grant such cooperative a franchise to serve the annexed area" or, as the City of Cookeville chose to do here, "offer to purchase any electric distribution properties and service rights within the annexed area owned by any electric cooperative."  Tenn. Code Ann. § 6-51-112(a).  The same Tennessee statute that requires this choice also provides a formula for determining the amount of compensation that the municipality must offer the cooperative.  *See* Tenn. Code Ann. § 6-51-112(a)(2).  As part of this compensation, the municipality must offer "[a]n amount equal to the cost of constructing any necessary facilities to reintegrate the system of the cooperative outside the annexed area after detaching the portion to be sold."  Tenn. Code Ann. § 6-51-112(a)(2)(B).

Cookeville annexed nine areas in which the Upper Cumberland Electric Membership Corporation ("UCEMC") provided electric services.  Cookeville sued UCEMC, originally in state court, to condemn UCEMC's facilities and electric service rights in the annexed areas.  RUS was later added as a defendant.  Cookeville and UCEMC disagreed on the cost of reintegration—Cookeville argued that the cost was approximately $127,000 whereas UCEMC argued that the cost was $5.825 million.  The district court agreed with UCEMC and ordered Cookeville to pay the higher amount so that UCEMC could build a new substation and distribution loop.  Cookeville appealed.  While that appeal was pending, Cookeville began building electric facilities in the annexed areas and providing electric services to customers in those areas.  UCEMC sought and obtained an injunction from the district court enjoining Cookeville from building facilities or providing service until it paid UCEMC the damages owed for the condemnation.  Cookeville appealed, and now the propriety of both the damage award and the injunction are before this court.  Cookeville also challenges the district court's jurisdiction over the entire case and the district court's jurisdiction to enter the injunction while the first appeal was pending.

The district court properly exercised jurisdiction because a federal agency was a party.  The district court order requiring Cookeville to pay reintegration costs of $5.825 million was legally proper and not clearly erroneous.  The district court's injunction, entered during the pendency of the appeal from the district court's compensation order, however, improperly expanded the scope of the previous order.  We therefore affirm in part and reverse in part.

**I.**

In 2000, Cookeville annexed five areas surrounding the city.  In 2002, Cookeville annexed four additional areas.  With respect to each annexed area, Cookeville gave notice to UCEMC, an electric cooperative serving customers in the annexed areas, as required by Tennessee law, but

UCEMC refused to sell voluntarily any of its electric distribution properties or service rights in those areas. *See* Tenn. Code Ann. § 6-51-112(a)(1) (requiring notice).

*Removal and Denial of Motion to Remand*

On July 31, 2001, Cookeville brought a civil action against UCEMC in Tennessee state court in order to condemn UCEMC's facilities and service rights. On August 14, 2002, Cookeville amended its complaint and added RUS and National Rural Utilities Cooperative Finance Corporation ("CFC") as defendants. RUS is a federal agency. *See* 7 U.S.C. § 6942. RUS and CFC each hold a security interest in all of UCEMC's equipment and service rights within the annexed areas. UCEMC, RUS, and CFC removed the case under 28 U.S.C. § 1442(a)(1) to the United States District Court for the Middle District of Tennessee. Cookeville then filed a motion to remand in the district court arguing that the district court lacked subject matter jurisdiction.

The district court denied Cookeville's motion to remand. *Tennessee ex rel. City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 256 F. Supp. 2d 754, 758 (M.D. Tenn. 2003). Section 1442 states that "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue" can remove a civil action to the district court. Courts have also required as necessary for removal under this statute that the defendant assert a colorable federal defense. Here, the district court held that "[c]learly, the RUS is an agency of the United States being sued for acting under color of its office in this case." *Tennessee ex rel. City of Cookeville*, 256 F. Supp. 2d at 758. The court also held that defendants asserted the colorable federal defense of preemption because they "adequately pled" such a defense and the defense was an issue the district court needed to decide. *Id.*

*Tennessee Statute*

The crux of this case is what compensation Cookeville must pay to UCEMC for UCEMC's facilities and service rights in the annexed areas. Tennessee law provides the following formula for determining the amount of compensation an annexing municipality must pay an electric cooperative:

> The municipality shall offer to purchase the electric distribution properties of the cooperative located within the annexed area, together with all of the cooperative's rights to serve within such area, for a cash consideration, which shall consist of:
>
> > (A) The present-day reproduction cost, new, of the facilities being acquired, less depreciation computed on a straight-line basis; plus
> > (B) An amount equal to the cost of constructing any necessary facilities to reintegrate the system of the cooperative outside the annexed area after detaching the portion to be sold; plus
> > (C) An annual amount, payable each year for a period of ten (10) years, equal to the sum of:
> > (i) Twenty-five percent (25%) of the revenues received from power sales to consumers of electric power within the annexed area, except consumers with large industrial power loads greater than three hundred kilowatts (300kW), during the last twelve (12) months preceding the date of the notice provided for in subdivision (a)(1); and

(ii) Fifty percent (50%) of the net revenues, which is gross power sales revenues less wholesale cost of power including facilities rental charge, received from power sales to consumers with large industrial power loads greater than three hundred kilowatts (300kW) within the annexed area during the last twelve (12) months preceding the date of the notice provided for in subdivision (a)(1).

Tenn. Code Ann. § 6-51-112(a)(2). Cookeville and UCEMC agreed on the first and third elements of the statutory formula. Cookeville agreed to pay UCEMC $1,136,325.25 for the present-day reproduction cost, new, less depreciation of UCEMC's electric distribution properties located in the annexed areas. Cookeville also agreed to make ten annual payments to UCEMC of $276,330 to comply with section 6-51-112(a)(2)(C).

*Trial*

Cookeville and UCEMC did not agree on the second element of the statutory formula: "the cost of constructing any necessary facilities to reintegrate the system of the cooperative outside the annexed area after detaching the portion to be sold." *See City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 360 F. Supp. 2d 873, 879 (M.D. Tenn. 2005) (quoting Tenn. Code Ann. § 6-51-112(a)(2)(B)). At a bench trial in November of 2004, each side presented testimony of an expert who had produced a "reintegration" plan. Cookeville's expert, Thomas M. Barnes, testified about the report that he prepared. In the report, Barnes stated that to reintegrate UCEMC's system, UCEMC would only need to construct facilities in one of the annexed areas and would incur "costs related to coordination of the facility transfer" and "a restocking charge of metering equipment" in all of the annexed areas. Barnes estimated the total reintegration costs to be $127,282.64. Prior to the annexations, Cookeville and UCEMC shared a Cookeville-owned substation in West Cookeville ("West Substation"), and Barnes' plan anticipated that UCEMC would continue to use that substation.

UCEMC's expert, Robert C. Dew, Jr., testified about the report that he prepared. In his report, Dew concluded that UCEMC needed a new substation and distribution loop built. Dew estimated that this would cost $5.825 million. Dew's plan anticipated that UCEMC would no longer use the West Substation after the annexations. At trial, Dew testified that the new substation was needed to "have the same operational flexibility, same capacity, same reliability, and better efficiency" as compared to UCEMC's system prior to the annexation. Dew testified that after Cookeville removes UCEMC's former customers, UCEMC will be left with extra line that continues through the annexed areas without serving any customers, resulting in increased costs from maintaining the line and losing electricity due to resistance in that line.[1]

*District Court Decision*

The district court agreed with UCEMC and found that the disputed second part of the formula equaled $5.825 million. *City of Cookeville*, 360 F. Supp. 2d at 879.[2] In coming to that conclusion, the court first noted that "[t]here was some argument at trial as to whether [the statutory]

---

[1] When a current is run through an electrical line with resistance, some of the electrical energy is converted to heat and lost. The longer the line, the more resistance between the substation and the consumer, and thus the more electricity lost.

[2] The district court first held that the proposed condemnation did not frustrate the purpose of the Rural Electrification Act ("REAct"). *City of Cookeville*, 360 F. Supp. 2d at 875-78. Neither party challenges this part of the court's ruling.

definition meant the cost of returning the system to running as well as it had before or whether it meant the cost of making the system adequate for operation." *Id.* The court concluded that "reintegration costs are those costs associated with returning the system to running as well as [it] had before the condemnation—no extra inefficiencies and no extra costs related to the system." *Id.* The district court found "that reintegration costs equal the cost of a new substation and the cost of restoring UCEMC's distribution loop with the new substation." *Id.* This was because the condemnations otherwise "would lead to inefficient electric distribution" for UCEMC due to the loss of electricity along lines no longer serving UCEMC customers and due to the maintenance of those lines. *Id.*[3]

Overall, the district court found that UCEMC's condemnation damages totaled "a single payment of $6,961,325.25 and 10 annual payments of $276,330.00 per year." *Id.*

*Motions to Alter or Amend and Appeal*

Cookeville and UCEMC moved to alter or amend the court's order. The issues presented in the motions involved how and when Cookeville was to pay UCEMC, whether UCEMC would be allowed to petition the court for additional reintegration costs if the cost of building the substation and distribution loop exceeded $5.825 million, and whether Cookeville was condemning feeder lines associated with Cookeville's West Substation. The district court denied the motions of Cookeville and UCEMC as to the means and timing of payment because there was "no good reason that the parties should not be able to come to a resolution of how to execute the judgment." The court also held that $5.825 million was the maximum amount Cookeville had to pay and that if the "actual costs are less than that amount, the remaining amount shall revert to or remain with" Cookeville. Finally, the court held that Cookeville did not condemn the feeder lines, which remained UCEMC's property.

Both parties appealed. UCEMC later voluntarily dismissed its cross-appeal.

*Injunction*

While the appeal (No. 05-5886) was pending, Cookeville began constructing electric distribution facilities inside some of the annexed areas. Cookeville admits that it installed street lighting and other electric facilities in the annexed areas, but maintains that none of those facilities serviced UCEMC's pre-annexation customers. Cookeville explained that it has only "begun to serve new customers, *i.e.*, customers who had moved into the annexed areas (into the City of Cookeville) after the annexation and who had not previously been UCEMC customers."

On December 2, 2005, defendants filed with the district court a joint motion for injunctive relief and costs. Defendants moved for an order compelling Cookeville to "immediately transfer to UCEMC all electric service currently being provided by [Cookeville] within UCEMC's exclusive service territory," enjoining Cookeville "from constructing electric distribution facilities and/or servicing customers within UCEMC's exclusive service territory," and requiring Cookeville "to pay all reasonable costs and attorneys' fees incurred by [d]efendants in connection with bringing" the motion. Cookeville responded by arguing that the district court lacked jurisdiction to issue an

---

[3]The district court also made a number of rulings not challenged on appeal. The district court refused to include as reintegration costs the cost of power lines within the annexed areas because no evidence was presented at trial regarding those costs. *Id.* The court also refused to make an upward adjustment sought by UCEMC in the amount of over $3.1 million for "lost revenue from [supposedly] low cost/high profit customers [in the annexed areas]." *Id.* & n.5. Finally, the court declined to make a downward adjustment sought by Cookeville for defendants' purported "delay in complying with the Tennessee law related to condemnations." *Id.* & n.6.

injunction because the notice of appeal filed in appeal No. 05-5886 transferred jurisdiction to the court of appeals, and that even if the district court had jurisdiction, it should not issue an injunction because post-annexation, a municipality has the right to provide electric service, not an electric cooperative.

On January 6, 2006, the district court granted defendants' motion for injunctive relief and costs. The court concluded that Cookeville was

> unlawfully constructing new electric distribution facilities and providing electric services to customers within one or more of the nine annexation areas at issue in this case; that such annexation areas [were] within the statutorily-assigned exclusive service territory of [UCEMC]; and that while [Cookeville had] sued to condemn UCEMC's exclusive service rights associated with these annexations areas, it ha[d] not yet paid the condemnation damages awarded and [wa]s not entitled to the use and benefit of such exclusive service rights until UCEMC ha[d] been fully compensated
> . . . .

Accordingly, the district court held that Cookeville's actions constituted "an unlawful interference with UCEMC's exclusive service rights to the nine annexation areas." The district court ordered Cookeville to "transfer to UCEMC within 30 days . . . all electric service customers within any of the nine annexation areas that are currently being served by" Cookeville. Furthermore, the court enjoined Cookeville from providing electric service to customers within the annexed areas until appeal No. 05-5886 is resolved and Cookeville pays in full "the ultimate damage award to UCEMC, including reintegration costs, . . . or until otherwise ordered" by the district court. Finally, the court ordered Cookeville to pay defendants' reasonable costs and attorneys' fees associated with the injunction motion because it found that Cookeville's actions were "not undertaken in good faith, and that said interference continued despite reasonable efforts by [d]efendants to avoid needless additional litigation." Cookeville filed a timely notice of appeal of this order (No. 06-5363).

## II.

We affirm the district court's order in appeal No. 05-5886. Defendants properly removed the case to the district court and the district court's decision on the merits awarding reintegration costs of $5.285 million to UCEMC was not clearly erroneous. However, we vacate the district court's injunction in appeal No. 06-5363. The district court did not have jurisdiction to issue the injunction because the injunction sought to expand the district court's previous order.

*1.    Removal Jurisdiction*

Defendants properly removed this action to federal court.[4] A civil action may be removed to the federal district court if the action is brought against

---

[4] As a preliminary matter, RUS argues that this court cannot entertain the issue of removal jurisdiction because Cookeville failed to raise this issue in its notice of appeal. This contention lacks merit. Federal subject matter jurisdiction can of course be challenged at any stage of the litigation, and jurisdiction cannot be created by waiver. *See Ohio v. Doe*, 433 F.3d 502, 505-06 (6th Cir. 2006); *Alongi v. Ford Motor Co.*, 386 F.3d 716, 728 (6th Cir. 2004); *Fed. Nat'l Mortgage Ass'n v. LeCrone*, 868 F.2d 190, 192 n.3 (6th Cir. 1989). In any event, Cookeville appealed from the final order of the district court and this court consequently may consider any earlier errors to which Cookeville objected. Where a party indicates in its notice of appeal that it appeals from the district court's final order, this court considers any alleged errors that occurred prior to the final order. *United States v. Sandles*, 469 F.3d 508, 518 n.6 (6th Cir. 2006). Here, Cookeville's notice of appeal stated that it appealed "from the final order of the District Court." Therefore, we may consider the removal issue.

> [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). In the context of federal officer removal, the Supreme Court has held that the officer "must both raise a colorable federal defense and establish that the suit is '*for* a[n] act under color of office.'" *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting 28 U.S.C. § 1442(a)(1)) (citation omitted; emphasis and alteration in *Acker*).

Although the parties assume that the *Jefferson County v. Acker* officer removal test applies to federal agency removal as well, the text and legislative history of § 1442(a)(1) demonstrate that any federal agency sued can always remove under § 1442(a)(1) because the "sued" clause in that provision applies only to federal officers.[5]

The text of § 1442(a)(1), is best read to mean that the three entities that can remove are (1) the United States; (2) any agency thereof; or (3) any officer of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office. A possible different reading—assumed by the parties in this appeal—is that the three entities that can remove are (1) the United States; (2) any agency thereof; or (3) any officer of the United States or of any agency thereof; and that each of these entities must be sued in an official or individual capacity for an act under color of such office. Although the latter reading is supported by the placement of a comma directly preceding the word "sued" (suggesting that everything after the comma (*i.e.*, the "sued" clause) applies to each element of the list before the comma: the United States, any agency thereof, or any officer of the United States or any agency thereof), that reading does not make sense because the United States and federal agencies are not "sued in an official or individual capacity" and are not sued for an "act under color of such office." Indeed, distinguished scholars of federal jurisdiction have questioned whether amended § 1442(a)(1) should "be read to permit the United States to remove only when it is 'sued in an official or individual capacity for any act under color of such office'—perhaps a null set and surely a peculiar category." *See* Richard H. Fallon, Jr., Daniel J. Meltzer & David L. Shapiro, *Hart and Wechsler's The Federal Courts And The Federal System* 910 (5th ed. 2003). Moreover, the Supreme Court rejected an interpretation of an earlier version of the statute that would have applied a similar "sued" clause to agencies because under that interpretation, the statute "read[] very awkwardly" because "[a]n agency would not normally be described as exercising authority 'under color' of an 'office.'" *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 80 (1991). Our independent reading of the text of § 1442(a)(1) is thus that a federal agency defendant may remove without more.

---

[5]The removal statute, § 1442(a)(1), is broad and allows for removal when its elements are met "regardless of whether the suit could originally have been brought in a federal court." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969). But as the Ninth Circuit reasoned in a case involving prior exclusive jurisdiction, *State Eng'r of Nev. v. S. Fork Band of Te-Moak Tribe*, 339 F.3d 804, 809 (9th Cir. 2003), "[§] 1442 is not a trump. If there are specific jurisdictional bars elsewhere that prevent the district court from asserting jurisdiction, the general removal provision cannot overcome the jurisdictional defect." *See also Nebraska ex rel. Dep't of Soc. Servs. v. Bentson*, 146 F.3d 676, 678-79 (9th Cir. 1998) (express deprivation of subject matter jurisdiction under 26 U.S.C. § 6305). Indeed, the legislative history of the 1996 amendment to § 1442 indicates that one purpose of giving agencies the power to remove was to "fulfill[] Congress' intent that questions concerning the exercise of Federal authority, the scope of Federal immunity and Federal-State conflicts be adjudicated in Federal court." S. Rep. No. 104-366, at 31 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4202, 4210-11. Cookeville does not identify any preclusive rule that would have divested the district court of jurisdiction after removal.

The legislative history provides compelling confirmation of this reading.[6] The addition of "The United States or any agency thereof" was the result of a 1996 amendment that sought to reverse an earlier Supreme Court decision. In *International Primate Protection League*, 500 U.S. at 79-82, the Supreme Court held that the pre-1996 version of § 1442 permitted only federal officers, not federal agencies, to remove suits to federal courts. The pre-1996 version stated that, "Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue" could remove a civil action to district court. Congress responded by replacing the beginning of the section (up to the phrase "or on account of") with the current language at issue. *See* S. Rep. No. 104-366, at 6-7, 30-31 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4202, 4202, 4210-11. This effectively added the United States and "any agency thereof" as parties that could remove cases to district court. *Id.* at 31 (noting that the amendment "legislatively reverses the Supreme Court's decision in *International Primate Protection League*").

The Senate Report supports a reading that § 1442(a)(1) as amended permits a federal agency to remove to federal district court without limitation. The Senate Report in multiple places separates the "sued" clause from reference to an agency and includes that clause only with reference to officers. For example, the Senate Report notes that the amended statute "allows civil actions . . . against Federal agencies as well as those against Federal officers sued in either an individual or official capacity to be removed to Federal district court." *Id.* at 30. The Senate Report goes on to state that the amendment "clarifies that suits against Federal agencies, as well as those against Federal officers sued in either an individual or official capacity, may be removed to Federal district court." *Id.* at 31. The Report, therefore, demonstrates that the "sued" clause applies only to federal officers and not to federal agencies. Such a reading is consistent with the "clear command from both Congress and the Supreme Court" that § 1442 is to be interpreted "broadly in favor of removal." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006). RUS therefore properly removed the action to the district court under § 1442(a)(1) because RUS is a federal agency.

We recognize that other courts of appeals have suggested that a federal agency may also have to assert a colorable federal defense. *See City of Jacksonville v. Dep't of the Navy*, 348 F.3d 1307, 1313 n.2 (11th Cir. 2003) ("We recognize that it remains to be decided whether the requirement of a federal defense also applies to removal by the United States or one of its agencies."); *Parker v. Della Rocco*, 252 F.3d 663, 665 n.2 (2d Cir. 2001) (expressly not deciding whether a colorable federal defense is required for agency removal); *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001) (finding that the United States had asserted a colorable federal defense for removal under § 1442 rather than rejecting the need for one). The requirement of a colorable federal defense, however, is not only not supported by the statutory language, but also is not necessary to ensure the constitutionality of § 1442(a) under Article III of the Constitution. Article III, section 2 extends the federal judicial power "to Controversies to which the United States shall be a Party."[7] This case is thus different from *Mesa v. California*, 489 U.S. 121, 136-37 (1989), in which the Supreme Court rejected the government's argument that a federal defense is not required for officer removal. The *Mesa* Court reasoned that an interpretation of § 1442 requiring such a defense ensures Article III

---

[6] We are mindful of the limited utility and reliability of legislative history. In this regard, "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

[7] This constitutional language of course does not lift the sovereign immunity of the United States. In this case, however, the federal agency consented to jurisdiction so that, as agreed by RUS counsel at oral argument, there is no sovereign immunity issue in this case. *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002) (holding that State waives Eleventh Amendment immunity when it removes to federal court).

jurisdiction by virtue of the case's "arising under" federal law. *Id.* No such interpretation is required where the United States is a party.

But even if a colorable federal defense were required, RUS fulfilled this requirement by asserting the defense of preemption. Defendants argued that federal law preempted Cookeville's proposed condemnation of UCEMC's facilities because the condemnation frustrated the purposes of the Rural Electrification Act of 1936 ("REAct"), 7 U.S.C. §§ 901-950bb (as amended). *City of Cookeville*, 360 F. Supp. 2d at 875. The district court noted that this was an issue of first impression in the Sixth Circuit, and that other courts had split on the issue. *Id.* at 875. *Compare Pub. Util. Dist. No. 1 of Pend Oreille City v. United States*, 417 F.2d 200 (9th Cir. 1969) (disregard of federal interest precluded condemnation under state law), *Pub. Util. Dist. No. 1 of Franklin County v. Big Bend Elec. Coop., Inc.*, 618 F.2d 601 (9th Cir. 1980) (condemnation under state law not permitted after disapproval by the Rural Electrification Administration), *City of Morgan City v. S. La. Elec. Coop. Ass'n*, 31 F.3d 319 (5th Cir. 1994) (state-law condemnation preempted by REAct), *with City of Stilwell v. Ozarks Rural Elec. Coop. Corp.*, 79 F.3d 1038, 1043-46 (10th Cir. 1996) (REAct does not preempt Oklahoma condemnation statute), *Tlingit-Haida Reg'l Elec. Auth. v. Alaska*, 15 P.3d 754, 766-68 (Alaska 2001) (similar). Although the district court ultimately sided with Cookeville and held that the REAct did not preempt Tennessee law permitting the condemnations (a decision defendants do not challenge on appeal), this does not mean that the defense was not colorable. For instance, in *Acker*, 527 U.S. at 431, the Supreme Court concluded that defendants presented a colorable federal defense of intergovernmental tax immunity even though the Court ultimately rejected that defense. *See also Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) ("[A colorable federal defense] need only be plausible; its ultimate validity is not to be determined at the time of removal."). Here, where the federal defense was an issue of first impression in this court and had previously found success in other circuits, one would be hard pressed to say that the defense was not colorable. Therefore, RUS properly removed the action to the district court even if assertion of a colorable federal defense were required for agency removal under § 1442(a)(1).

## 2.    Reintegration Costs

The district court did not clearly err by holding that Cookeville must pay to build UCEMC a new substation and distribution loop. Tennessee law requires as part of the compensation that an annexing municipality must pay to an electric cooperative "[a]n amount equal to the cost of constructing any necessary facilities to reintegrate the system of the cooperative outside the annexed area after detaching the portion to be sold." Tenn. Code Ann. § 6-51-112(a)(2)(B). Cookeville argues that the district court erred by awarding reintegration compensation of $5.825 million for two reasons: (1) the district court applied an incorrect legal standard by requiring financial efficiency even though the statute requires only engineering efficiency; and (2) even if the district court applied the correct legal standard, UCEMC's reintegration plan, which the district court adopted, does not comply with that standard. This court reviews the district court's conclusions of law de novo and findings of fact for clear error. *Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 365-66 (6th Cir. 2003).

### a.    *Legal Standard*

The district court applied a legal standard that is consistent with Tennessee law.[8] The district court interpreted reintegration costs under the Tennessee statute to mean "those costs associated with returning the system to running as well as [it] had before the condemnation—no extra inefficiencies and no extra costs related to the system." *City of Cookeville*, 360 F. Supp. 2d at 879. The Tennessee statute does not define "reintegrate" but the dictionary definition of "reintegrate" is "to restore to unity after disintegration." Webster's Third New International Dictionary 1915 (3d ed. 2002). The structure of section 6-51-112(a)(2) suggests that the reintegration costs are those necessary to place the system in the same state of integration that it was in prior to the condemnation. Section 6-51-112(a)(2)(A) provides for replacement costs for any facilities acquired by the municipality whereas section 6-51-112(a)(2)(B) then provides for the cost of constructing "necessary facilities to reintegrate the system of the cooperative." This scheme suggests that the reintegration costs are those necessary to reconnect the replaced facilities into the cooperative's existing electrical system. To bring the system back to "unity" would involve placing the system in as integrated a condition as existed prior to the annexation.

Cookeville argues that this standard was incorrect because it read into the statute "an additional requirement that cost inefficiencies, not just engineering disruptions, be compensated as part of the reintegration element of the statutory formula." The distinction Cookeville asks this court to draw between engineering and economic efficiency is largely semantic. It is not clear how an engineering inefficiency would not be costly, or how any increased cost would not be caused by engineering.[9] Cookeville refers to no authority for such a distinction in the statute, legislative history, case law, or any other source. There is nothing in the statute that purports to limit reintegration costs only to "engineering" efficiency. The statute instead seeks to place the electric cooperative in the same position it was prior to the municipality's condemnation of its facilities.[10]

### b.    *Factual Findings*

The district court's determination of the amount of reintegration costs was largely factual in nature, and the district court did not clearly err in its findings.

First, the district court did not clearly err by rejecting Cookeville's proposed reintegration plan. The question under the statute is what "necessary facilities" must be built in order to "reintegrate" UCEMC's distribution system. The district court agreed with UCEMC that Cookeville's reintegration plan, which involved maintaining UCEMC's use of the West Substation, created inefficiencies because UCEMC would incur extra costs in maintaining several miles of extra power lines leading to UCEMC's first customers and from losing electricity along those extra lines. *See City of Cookeville*, 360 F. Supp. 2d at 879. This finding is not clearly erroneous because there was adequate support in the record, in particular, the report and testimony of UCEMC's expert,

---

[8]Defendants first argue that Cookeville should either be estopped from making this argument because Cookeville endorsed the same legal test at trial or should be deemed to have waived this argument because Cookeville failed to object or suggest another legal standard at trial. Cookeville proposed a reintegration plan that included inefficiencies and argued that this plan was consistent with the statute. Therefore, Cookeville neither is estopped from making, nor has forfeited, this argument on appeal.

[9]Indeed, the district court rejected an adjustment for loss of high paying customers. *See supra* n.3.

[10]As an alternative basis for upholding the district court's legal standard, defendants argue that Tennessee law permits the district court to modify the statutory formula for compensation. Because the district court applied a standard consistent with the statute, we do not need to reach this alternative argument.

Dew, for the fact that Cookeville's reintegration plan failed to account for inefficiencies added to UCEMC's electric distribution network.

The district court also did not clearly err by accepting UCEMC's reintegration plan. Arguably, UCEMC's reintegration plan results in a distribution system even more efficient than UCEMC previously had. In his report, Dew noted that UCEMC's plan "assumes that UCEMC's post-annexation Putnam County distribution system should operate *at least as efficiently* and as reliably as it does in its current configuration" (emphasis added). At trial, Dew stated that in formulating the UCEMC plan, he determined that the plan "had to have the same . . . operational flexibility, the same capacity, the same reliability[, and h]opefully, *improved* efficiency" (emphasis added). But once the district court concluded that Cookeville's plan did not meet the minimum required by Tennessee Code section 6-51-112(a)(2)(B), the district court was left only with UCEMC's plan, which did meet the minimum requirements of the statute. Cookeville did not propose an alternative plan—for example, a cost-shifting arrangement where UCEMC would continue to use the West Substation but Cookeville would compensate UCEMC for cost inefficiencies.[11] The district court's finding that UCEMC's plan was required was therefore not clearly erroneous. When left with the choice between two plans—one that was below the required minimum and one that was arguably above that minimum—the district court did not clearly err by requiring the only option that complied with the statute. Therefore, we affirm the district court's order requiring Cookeville to pay UCEMC up to $5.285 million in reintegration costs to construct a new substation and distribution loop.

*3.      Injunction*

The district court, however, erred by issuing the injunction in appeal No. 06-5363 because the injunction expanded the district court's previous order on appeal in No. 05-5886 instead of merely enforcing it. "As a general rule the filing of a notice of appeal divests the district court of jurisdiction and transfers jurisdiction to the court of appeals." *Cochran v. Birkel*, 651 F.2d 1219, 1221 (6th Cir. 1981). "Although a district court may not alter or enlarge the scope of its judgment pending appeal, it does retain jurisdiction to enforce the judgment." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987). This court draws a "crucial distinction between *expansion* and *enforcement* of judgments." *Am. Town Ctr. v. Hall 83 Assocs.*, 912 F.2d 104, 110 (6th Cir. 1990) (emphasis in original). Here, in the injunction order, the district court decided two legal issues that it had not decided previously, and expanded significantly the scope of its previous order on appeal.

First, the district court decided that UCEMC enjoyed exclusive service rights in the annexed areas. In its order appealed in No. 05-5886, the district court merely decided the amount Cookeville was required to pay UCEMC in reintegration costs for annexing areas where UCEMC provided electric service. Whether UCEMC enjoyed exclusive service rights in those areas after Cookeville's annexation was not at issue. Thus, when the district court later enjoined Cookeville from "interfering" with UCEMC's exclusive service rights by providing electric service to new customers in the annexed areas, the district court was deciding an issue of law that went beyond the scope of the court's initial order that was on appeal at the time of the injunction, and granting relief beyond the scope of the earlier order.

---

[11] We do not suggest that such a proposal would itself be consistent with the statute. The statute defines reintegration costs as "[a]n amount equal to the cost of *constructing* any necessary facilities," Tenn. Code Ann. § 6-51-112(a)(2)(B) (emphasis added), and thus might not include payments that are not for constructing facilities, but are instead meant to compensate the electric cooperative for cost inefficiencies.

Second, the district court decided that Cookeville was required to compensate UCEMC prior to taking UCEMC's property.[12]  In denying UCEMC's motion to alter or amend the earlier order with respect to the timing of the payments, the district court refused to determine the means and timing of Cookeville's payments to UCEMC because there was "no good reason that the parties should not be able to come to a resolution of how to execute the judgment."  The court also noted that the $5.825 million awarded to UCEMC was "a maximum amount for reintegration damages" and that "[i]n the event that actual costs are less than that amount, the remaining amount shall revert to or remain with" Cookeville.  While that decision was on appeal to this court, the district court issued its injunction, which determined that Cookeville "is not entitled to the use and benefit of [UCEMC's] exclusive service rights until UCEMC has been fully compensated."  This decision expanded the district court's earlier judgment, which explicitly declined to determine the timing of Cookeville's payments.  Nowhere in the earlier order did the district court require Cookeville to compensate UCEMC prior to condemning UCEMC's property or building electric distribution facilities in the annexed areas.  Also, the earlier order suggested that Cookeville might pay less than the $5.825 million owed by indicating that if the costs were lower than estimated, the savings might "remain" with Cookeville.  Thus, the earlier order left open the question of whether Cookeville was required to compensate UCEMC prior to condemnation.  Therefore, by requiring Cookeville to pay UCEMC prior to providing electric service within the annexed areas, the district court improperly expanded an order on appeal to this court and thus exceeded its jurisdiction.

### III.

For the foregoing reasons, we **AFFIRM** the district court's order challenged in appeal No. 05-5886 and **REVERSE** the district court's injunction order challenged in appeal No. 06-5363.

---

[12]In addition, it appears that the district court erred on the merits in entering the injunction.  Under Tennessee law, a municipality may condemn private property prior to paying compensation.  In *Zirkle v. City of Kingston*, 396 S.W.2d 356, 360-62 (Tenn. 1965), the Supreme Court of Tennessee held that a municipality could take control of private water and sewer lines on annexed property notwithstanding the fact that the municipality had not paid just compensation to the owner of the lines prior to taking control of them.  *See also White v. Nashville & N.W. R. Co.*, 54 Tenn. (7 Heisk.) 518 (1872) ("[I]t is the approved opinion that property in this country when taken for public use need not be paid for before being taken."); *cf. Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984) ("The Fifth Amendment does not require that compensation precede the taking.").  UCEMC points to a Tennessee statute that prohibits the taking of property until damages are paid.  *See* Tenn. Code. Ann. § 29-16-122.  However, the *Zirkle* court referred to similar language in a prior version of this statute, but nonetheless the court held that the municipality could still condemn the water and sewer lines prior to paying compensation because an injunction was not an appropriate remedy where the property owner could later sue for damages.  396 S.W.2d at 360-62.  Therefore, it is doubtful that the district court could have enjoined Cookeville from encroaching on UCEMC's service rights prior to paying compensation, even if it had jurisdiction.